```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/14/2022
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

PANTHEON PROPERTIES, INC., et al.,

                            Plaintiffs,              20-CV-03241 (ALC)(SN)

      -against-                                 **OPINION & ORDER**

JOHNATHEN HOUSTON, et al.,

                            Defendants.

-----------------------------------------------------------------X

**SARAH NETBURN, United States Magistrate Judge:**

       Defendants Johnathen Houston ("Houston"), Marvin M. Love ("Love"), JH Consulting Firm LLC ("JHC"), and M & M Lightning Strikes ("M&MLS"), move pursuant to Federal Rule of Civil Procedure 64 and New York's Civil Practice Law and Rules ("CPLR") § 6201 to vacate the order attaching bank accounts belonging to Houston and JHC. ECF No. 82. Defendants' motion is DENIED.

                                               **BACKGROUND**

       Plaintiffs sued Houston, Love, JHC, and M&MLS, alleging that Houston, who was previously employed as an executive assistant by Pantheon, embezzled at least $272,000 during his term of employment. ECF No. 46, Second Amended Complaint ("SAC") at ¶¶ 1, 18. Pantheon manages several properties in the New York City area and contracts with third-party vendors to provide services such as groundskeeping, maintenance, rent collection, marketing, and payment of bills and invoices for its clients. Id. at ¶¶ 15–17. In their Second Amended Complaint, plaintiffs alleged that after their president and CEO, Kenneth Cohen, approved checks for payments to the third-party vendors, Houston changed the payee to either JHC or

M&MLS. Id. at ¶ 27. JHC is a limited liability company formed in New York on May 20, 2019, listing Johnathen Houston as its registered agent. See ECF No. 6, Ex. 8. Checks made out to M&MLS were mailed to an address in Texas that Houston had previously identified as the home of Love, his designated emergency contact. SAC at ¶ 29. Plaintiffs aver that neither JHC nor M&MLS has ever performed any work or services for Pantheon or its clients. Id. at ¶ 28. In total, 47 checks were paid to and negotiated by JHC and M&MLS between May 2019 and April 2020. ECF No. 89, Ex. 13. Cohen discovered the scheme in April 2020 when performing a routine review of Pantheon's bookkeeping records. SAC at ¶ 25. In addition, Pantheon alleges that Houston used its company credit card without authorization, purchasing more than $10,000 of products from Amazon for his personal use. Id. at ¶ 32. Plaintiffs assert causes of action for conversion, unjust enrichment, fraud, conspiracy to commit fraud, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) et seq. Id. at ¶¶ 34–63.

 Shortly after filing its initial complaint, Pantheon moved pursuant to Federal Rule of Civil Procedure 64 and CPLR § 6201 for an *ex parte* order attaching any New York property of Houston, JHC, and M&MLS in the amount of $166,108.36, including any cash, funds, credits, debts, wire transfers, accounts, or letters of credit. ECF No. 6, Application for *Ex Parte* Order of Attachment at 1–2. The application specifically names two Capital One accounts and one Navy Credit Union account. Id. at 2. In support of its application, Pantheon submitted copies of the canceled checks made out to M&MLS and JHC and property records showing that Houston had purchased a home in Texas in November 2019. See ECF No. 6, Ex. 3–5, Ex. 10. Plaintiffs subsequently moved to increase the total amount of the attachment to $261,841.01. ECF No. 18,

Supplemental Affidavit of Kenneth Cohen in Support of Plaintiffs' Application for an Order of Attachment at ¶ 8.

On May 12, 2021, the Court granted Plaintiffs' motion for an order of attachment. See ECF No. 20. As a result, three Navy Federal Credit Union accounts belonging to Houston, containing a total of $6,659.13, were frozen. ECF No. 89, Ex. 11, Affirmation of S. Aaron Loterstein, at ¶ 5; see also ECF No. 89, Ex. 3. Although Capital One attached an account belonging to JHC, that account had a negative balance of -$13.82. ECF No. 89, Ex. 2. An account associated with M&MLS had been closed on April 28, 2020, two days after the filing of the Complaint. Id. Although defendants subsequently responded to plaintiffs' motion, the Court denied their request that the order of attachment be lifted. See ECF No. 23, ECF No. 34. The case proceeded to discovery. See ECF No. 36.

Following the close of discovery, defendants moved to vacate plaintiffs' attachment of Houston's and JHC's accounts. See ECF No. 82. Defendants contend that plaintiffs are unlikely to prevail on their claims, arguing that plaintiffs have failed to produce invoices that correspond to the allegedly forged checks and presenting various counterarguments to plaintiffs' claim that Houston changed the payee information through Pantheon's bookkeeping system. See ECF No. 82, Ex. 1 Memorandum of Law ("Def. Br."). In general, defendants contend that Cohen authorized the payments. Id. at 3, 5. Plaintiffs opposed, arguing that the forensic evidence of embezzlement suggests that their likelihood of success on the merits is high, and that there remain grounds for attachment pursuant to CPLR § 6201. ECF No. 89, Memorandum of Law in Opposition ("Pl. Br.") at 13, 20.

**DISCUSSION**

**I.     Legal Standard**

A plaintiff in federal court may attach the assets of a defendant under the circumstances and in the manner provided by the law of the state in which the district court is located. Fed. R. Civ. P. 64; see also Cargill, Inc. v. Sabine Trading & Shipping Co., 756 F.2d 224, 227 (2d Cir. 1985). New York's CPLR § 6201 provides that "[a]n order of attachment may be granted in any action . . . where the plaintiff has demanded and would be entitled, in whole or in part . . . to a money judgment against one or more defendants," and as relevant here, either "the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state," or "the defendant, with the intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." In addition, the plaintiff seeking the order of attachment must show that (a) there is a cause of action; (b) it is probable the plaintiff will succeed on the merits; (c) one or more grounds for attachment provided in § 6201 exist; and (d) the amount demanded from the defendant exceeds all counterclaims known to the plaintiff. CPLR 6212(a): see also Cap. Ventures Int'l v. Republic of Argentina, 443 F.3d 214, 219 (2d Cir. 2006).

When a plaintiff has been granted an order of attachment, "the defendant can move to vacate or modify the order, and its motion will be granted unless the plaintiff can establish also 'the need for continuing the levy.'" Cap. Ventures Int'l, 443 F.3d at 219. The plaintiff also bears the burden of establishing the grounds for the attachment and the probability that it will succeed on the merits. CPLR § 6223(b); see also Davila Pena v. Morgan, 149 F. Supp. 2d 91, 93 (S.D.N.Y. 2001).

## II. Analysis

### A. Grounds for the Attachment

Plaintiffs have met their burden of establishing the grounds for the attachment under CPLR § 6201. CPRL § 6201(1) provides that an attachment may be granted where "the defendant is a nondomiciliary residing without the state." Plaintiffs argue that Houston is a resident of Texas, pointing to the fact that he provided a Texas driver's license issued in October 2020 when opening a bank account. ECF No. 89, Ex. 10 at 5. Houston's personal checking account lists a Texas address that corresponds to a property he purchased in November 2019. See ECF No. 6, Ex. 10; ECF No. 89, Ex. 10 at 3. Houston contends that he remains a resident of New York, leases an apartment in Harlem, and intends to return to the state after the COVID-19 pandemic. ECF No. 83, Fourth Affidavit of Johnathen Houston at ¶¶ 17–18. Plaintiffs counter that at his deposition, Houston testified that he currently rents out his room in New York on AirBnB and refused to say if he had traveled to New York between April and December of 2020. ECF No. 89, Ex. 5, Johnathen Houston Deposition ("Houston Dep.") at 14:17–15:20, 201:8–202:8. Regardless of the regularity of Houston's trips to New York, a non-resident's maintenance of a rental property in not sufficient to establish domicile for the purposes of attachment, "particularly given the absence of any showing that defendant has assets in New York sufficient to satisfy a judgment in the event plaintiff were to prevail." Davila Pena, 149 F. Supp. 2d at 93. Plaintiffs have submitted sufficient evidence to show that Houston is domiciled in Texas and currently resides there, and so there remain grounds for attachment of Houston's personal accounts under CPLR § 6201(1).

CPLR § 6201(3) states that an attachment may be granted where "the defendant, with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered

5

in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." The "mere removal, assignment or other disposition of property is not grounds for attachment under section 6201(3)" and "it is incumbent upon [plaintiff] to demonstrate that defendant is acting with an intent to defraud." Prabir v. Bukhara Indian Cuisine, Inc., No. 17-cv-3704 (AJN)(HBP), 2018 WL 2709231, at *3 (May 17, 2018) (internal quotations omitted), report and recommendation adopted 2018 WL 2694435 (S.D.N.Y. June 5, 2018). However, "[f]raudulent intent is rarely susceptible to direct proof," and so the Court of Appeals has identified certain "badges of fraud" that "establish the requisite actual intent to defraud," including transmitting funds to family or friends without consideration, "absconding with or secreting the proceeds of the transfer immediately after their receipt," and "the retention of possession, benefit, or use of the property in question." In re Kaiser, 722 F.2d 1574, 1582 (2d Cir. 1983).

As plaintiffs argued in their original application, they have produced evidence that Houston substituted his JHC account and the business account of co-defendant Love, his close friend, for legitimate third-party vendors. By sending checks to M&MLS – and later purchasing a home in Texas – Houston removed a significant percentage of the embezzled funds from the state. In their opposition to defendants' motion, plaintiffs have produced further evidence that after he deposited the checks in the JHC account, Houston spent thousands of dollars at luxury retailers such as Barneys New York, Balenciaga, Louis Vuitton, Bergdorf Goodman, and Gucci. See ECF No. 89, Ex. 4 at 10–20. New York courts have held that evidence that a defendant falsified business records and diverted company funds for personal use, including for "the purchases of jewelry, clothing, and furniture," was sufficient to support a finding of fraudulent intent. Mineola Ford Sales v. Rapp, 242 A.D.2d 371, 371–72 (2d Dep't 1997). Furthermore, after

the fraud was discovered, Houston withdrew or transferred more than $25,000 from his JHC account. ECF No. 89 at 22–24. When Houston was questioned at his deposition about how he spent the money, he answered evasively, refusing to clearly state how much was spent on business expenses. Houston Dep. at 429:2–431:1. The timing of Houston's withdrawals, his evasive answers to questions, and inability to account for how the funds were spent are also indicative of fraud. JSC Foreign Econ. Ass'n Technostroyexpert v. Int'l Dev. & Trade Serv., Inc., 306 F. Supp. 2d 482, 487–88 (S.D.N.Y. 2004); Prabir, 2018 WL 2709231, at *4; see also Vincent C. Alexander, Practice Commentaries, McKinney's Cons. Laws of N.Y. CPLR C6201:3. As such, plaintiffs have also met their burden of establishing grounds for attachment of the JHC bank account under CPLR § 6201(3).

### B. Continuing Need For Security

One of the two primary purposes of New York's attachment statutes is to secure judgments against defendants who reside outside the state, recognizing that "[t]here is much more propriety in requiring a debtor, whose domicile is without the state, to give security for the debt, than one whose domicile is within. Such a debtor, pending litigation, might sell his property, and remain at home, in which event he could not be reached by any of the provisional remedies or supplementary proceedings provided by [New York] laws." ITC Ent., Ltd. v. Nelson Film Partners, 714 F.2d 217, 220 (2d Cir. 1983) (quoting Houghton v. Ault, 16 How. Pr. 77, 84 (Sup. Ct.), aff'd 16 How. Pr. 87 (Sup. Ct. Gen. Term. 1858)). New York courts have found a need for continuing a levy for security purposes where the defendant was a nonresident, the assets in question were liquid or easily liquidated, and plaintiffs had advanced "substantial allegations of misappropriation." Deutsche Anlagen-Leasing GMBH v. Kuehl, 111 A.D.2d 69, 71 (1st Dep't 1985); CI Sys. (Israel) Ltd. v. Melamed, 290 A.D.2d. 266, 266 (1st Dep't 2002).

Plaintiffs have persuasively argued that Houston is a resident of Texas, that the assets in question are liquid, and that there is substantial evidence corroborating their allegations of misappropriation. Indeed, plaintiffs have shown that Houston withdrew thousands of dollars from the accounts in question after the discovery of the fraud, and, as a result, they were only successful in attaching less than $7,000, a small fraction of the more than $250,000 that Houston allegedly embezzled. Furthermore, there is no indication that Houston, JHC, or M&MLS have other assets in New York that would be sufficient to satisfy a judgment. See Davila Pena, 149 F. Supp. 2d at 94 (holding that there was a continuing need for security where defendant was a nonresident, his assets were located outside New York, and his answers regarding the assets were evasive). Therefore, there is sufficient evidence for the Court to infer the continuing need for security.

### C. Likelihood of Success on the Merits

In their Second Amended Complaint, plaintiffs assert four causes of action under New York law: conversion, unjust enrichment, fraud, and conspiracy to commit fraud. To succeed on these claims, plaintiffs must generally prove that the payments to JHC and M&MLS were unauthorized and fraudulently obtained, with resulting damages to plaintiffs. See Thyroff v. Nationwide Mut. Ins. Co., 460 F.3d 400, 403–04 (2d Cir. 2006) ("According to New York law, '[c]onversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.' . . . It also requires that the defendant exclude the owner from exercising her rights over the goods.'") (quoting Vigilant Ins. Co. of Am. v. Hous. Auth., 87 N.Y.2d 36, 55 (1995)); Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995) ("To prove common law fraud under New York law, a plaintiff must show that (1) the defendant made a material

false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."); Briarpatch Ltd., L.P v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004). ("The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."). In addition, plaintiffs assert two causes of action under the federal RICO statue. See 18. U.S.C. §§ 1962(c)–(d). For the purposes of an order of attachment, "[p]robability of success on the merits . . . requires that the moving party demonstrate that it is more likely than not that it will succeed on its claims and must show proof stronger than that required to make a prima facie case." Musket Corp. v. PDVSA Petroleo, S.A., 512 F. Supp. 2d 155, 160 (S.D.N.Y. 2007).

In support of their claims, plaintiffs offer a detailed theory of how Houston manipulated Pantheon's accounting systems to generate checks payable to JHC and M&MLS. Pantheon manages payments to third-party vendors using an accounting software called Yardi Voyager. ECF No. 89, Ex. 12 Affidavit of Kenneth Cohen ("Cohen Aff.") at ¶ 5. PAYscan is a companion product that allows authorized users to upload invoices or bills to create electronic transactions called "payables." Id. at ¶ 6. To pay invoices, either Houston or third-party payment services vendor FiTech would upload them into PAYscan. Id. at ¶ 8. Houston would then send the payables to Cohen for his review and approval, after which the payable would be "posted" to the ledger for the assigned client account in Yardi Voyager and checks would be printed and signed by Cohen. Id. at ¶¶ 8–10. However, it is also possible to manually enter expenses into Yardi Voyager without an accompanying invoice. Id. at ¶ 13. While this feature of the software was designed to generate recurring payments, it allows for the creation of checks without approval

9

from a manager. Id. Plaintiffs were unaware of this second method until they investigated the alleged embezzlement. Id. at ¶ 12–13.

Plaintiffs have identified 47 checks made out to JHC or M&MLS. ECF No. 89, Ex. 13. Plaintiffs state that four of these checks are associated with invoices, suggesting that the payee name was changed after the payable was generated and approved. Def. Br. at 8 n.5. But plaintiffs believe that most checks were created by using the second method of manually entering expenses into Yardi Voyager, which did not require Cohen's approval. Cohen Aff. at ¶ 14; see also ECF No. 89, Ex. 6, Cohen Deposition ("Cohen Dep.") at 79:11–15. Plaintiffs assert that Houston would initially identify a legitimate vendor as the payee, change the payee immediately before printing the check, and then revert the payee to the original vendor. Cohen Aff. at ¶ 14. As a result, only the legitimate vendor's name would appear in company records. Id.

The documentary evidence cited by plaintiffs supports this theory of how the checks were generated. A document titled "Audit Table Analytics," created using the audit function in Yardi Voyager (Id. at ¶ 17), documents at least 20 times that a payee name was changed to either JHC or M&MLS and then subsequently reverted to the original, legitimate, payee. See ECF No. 82, Ex. 2 at 189, 192–93, 200, 204, 205, 212, 213, 271–72, 272, 274, 276, 283, 317, 324, 325, 326, 333, 333-334, 337–338, 338. The user for each of these transactions is identified as "JH," Houston's user credential for Yardi Voyager. Id.; see also ECF 82, Ex. 2 at 47. In further support of this theory, the plaintiffs produced an email Houston sent on December 18, 2019, asking FiTech to enter an amount directly into Yardi, "NOT payscan," so that he could cut a check the same day. ECF No. 89, Ex. 7 at 3. The next morning, Houston changed the payee from K.C. Renovation, Inc., a legitimate third-party vendor, to JHC and printed the check. ECF No. 82, Ex. 2 at 324.

Defendants' attempts to undermine this evidence are unavailing. First, defendants argue that plaintiffs have failed to produce invoices corresponding to all 47 checks, but plaintiffs contend that the majority of the checks were created through the manual entry of payables in Yardi Voyager. Second, defendants argue that the payables that were manually entered were not recurring, but this mischaracterizes plaintiffs' argument, which is not that the second method exclusively generates recurring payments but rather that it was designed for this purpose. Third, defendants argue that 11 of the checks do not appear in the Audit Table Analytics, but plaintiffs explain that the audit function became available only in late June 2019 when the Yardi Voyager software was updated. Cohen Aff. at ¶ 17; see also Cohen Dep. 55:16-18. The 11 checks in question were created before the software update. See ECF No. 89, Ex. 13.

Fourth, defendants argue that plaintiffs' theory fails to account for how Cohen's signature was affixed to the checks. The plaintiffs allege that Houston forged Cohen's signature, pointing to an identical mistake on each of the checks. See ECF No. 89, Ex. 8. Without further evidence it is difficult to assess this claim, but plaintiffs did not overlook the issue.

Fifth, Houston argues that he was not in the office when several of the payee edits occurred, and that he could not have printed the checks remotely. He points to text messages with Cohen, screenshots from his Instagram stories, and the irregular times when the edits were made to support his contention that he was not in the office at those times. In response, Plaintiffs point out that the times shown in the Instagram stories' screenshots are likely in Central Standard Time because Houston currently resides in Texas, and so do not provide an effective "alibi" for the times when the edits occurred. ECF No. 89, Ex. 1, Affirmation of Erin C. O'Leary ("O'Leary Aff.") at ¶ 13. Furthermore, the Pantheon offices were accessible at all times, and all employees were provided with a key so they could access the office outside of regular business hours. ECF

No. 89, Ex. 16 Affidavit of Rebecca Ashkenazi, Esq. ("Ashkenazi Aff.") at ¶ 5. As a result, the fact that payee information was occasionally changed either very late at night or during the weekend does not contradict plaintiffs' argument that Houston was responsible for the changes.

Lastly, defendants cite to a single example where the check payee was not changed to JHC or M&MLS, but rather to Courtney Rock, allegedly an employee of M&MLS and a social acquaintance of Houston, as evidence that Pantheon framed Houston. Def. Br. at 15–18. Defendants' argument requires multiple logical leaps and is not substantiated by any other evidence, and as such does not call into question plaintiffs' allegation that Houston was responsible for the payee edits documented in the audit.[1]

Accordingly, plaintiffs have met their burden of showing that it is "more likely than not that [they] will succeed on [their] claims." Musket Corp., 512 F. Supp. 2d at 160.

## CONCLUSION

Because plaintiffs have met their burden of establishing the grounds for the attachment, the need for continuing the levy, and the probability that they will succeed on the merits,

---

[1] In addition, defendants argue that check 9743 was not printed in the window of time between when the vendor name was changed to JHC and when it was reverted to the original payee. In response, plaintiffs provide a forensic analysis that shows that Houston printed the check twice: first on February 13, 2020, when he failed to change the payee information, and again on February 18, 2020, when the payee was changed to JHC. ECF No. 96, Ex. 4. A check for the same amount, $20,732.65, was deposited in the JHC account the same day. ECF No. 89, Ex. 4 at 11. After the motion was fully briefed, defendants filed an additional reply brief arguing that this forensic analysis was inadmissible under Federal Rule of Civil Procedure 37(c)(1) because plaintiffs had failed to produce it in discovery. See ECF No. 94. Regardless of whether the plaintiffs properly submitted the analysis as evidence in support of its opposition to defendants' motion, the Court concludes that they have met their burden of showing a likelihood of success on the merits. Plaintiffs need only show that it is "probable" that they will succeed on the merits: the extensive documentary evidence they cite in support of their theory, including the Audit Table Analytics, Houston's emails to FiTech, and copies of the cashed checks, is sufficient to meet this standard for the purpose of a motion to vacate an order of attachment. Merrill Lynch v. Baninvensa Cap. Mkt., No. 94-cv-2778 (LLM), 1995 WL 380129, at *1 (S.D.N.Y. June 26, 1995).

defendants' motion to vacate the attachment is DENIED. The Clerk of Court is respectfully directed to close the motion at ECF No. 82.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED:     New York, New York
               March 14, 2022